**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**


| | |
|---|---|
| **(1) TOM D. TRIMBLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 16-CV-263-TCK-FHM** |
| ) | |
| **(1) BOARD OF COUNTY COMMISSIONERS** ) | |
| **of TULSA COUNTY, OKLAHOMA,** ) | |
| **(2) KAREN KEITH, and** ) | |
| **(3) RON PETERS,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**OPINION AND ORDER**</u>

Before the Court is the Motion to Dismiss Plaintiff's Complaint With Prejudice filed by

Defendants, Board of County Commissioners of Tulsa County, Oklahoma ("BOCC"), Commissioner

Karen Keith ("Keith"), and Commissioner Ron Peters ("Peters") (collectively, "Defendants") (Doc.

15).

**I.      Factual Allegations**[1]

Plaintiff Tom D. Trimble ("Plaintiff" or "Trimble") began working for the Tulsa County

Information Technology Department ("IT Department") in 1991.  In 2003, Plaintiff was promoted

to IT Manager.  Under his management, the IT Department received numerous accolades and awards.

In 2011, the United States Department of Homeland Security's Office of Civil Rights and

Civil Liberties ("CRCL") audited the Tulsa County Jail's ("Jail") medical system.  CRCL found

deficiencies with the Tulsa County Sheriff's Office ("TCSO") medical record system and found that

it "us[ed] a homegrown system of records that *'**fails to utilize what we have learned in the past 20***

---

[1]  The factual allegations set forth here are taken from Plaintiff's Complaint (Doc. 2).

*years*.'" (Compl. ¶ 13 (quoting ICE-CRCL Report, 9/29/11) (emphasis in original).) Around the same time, multiple civil rights lawsuits were filed against TCSO and the Jail's contract medical provider, Correctional Healthcare Companies, Inc. ("CHC"), arising from the deaths of inmates at the Jail. Subsequently, Tulsa County and TCSO, with input from the IT Department, decided to replace CHC as the Jail's medical provider.

The new medical provider at the Jail, Armor Correctional Health Services, Inc. ("Armor"), planned to implement a new electronic medical records system. Although changing the medical records system was "a difficult process requiring significant IT expertise and manpower" (Compl. ¶ 18), Plaintiff "learned, early on, that he[] and the IT Department would not be a part of the records system transition" (*id.* ¶ 19). Plaintiff received an email from the Director of the Tulsa County Purchasing Department, Linda Dorrell ("Dorrell"), stating that Armor would use its own IT staff and that TSCO Undersheriff Tim Albin ("Albin") "doesn't think you need to be involved" in the medical records transition. (*Id.* ¶ 21.) Plaintiff responded in an email to Dorrell that his team "only need[ed] to be involved with the medical system if they intend to connect to [the Tulsa County] network." (*Id.*)

Plaintiff later learned that Armor did in fact intend to connect to Tulsa County's network, which Plaintiff believed "raised serious concerns," because "if Armor was to connect to the County's system, without any involvement from the IT Department, it would compromise the safety of County data and systems," including inmate medical information. (*Id.* ¶ 22.) The new medical records system was scheduled to "go live" on November 1, 2013. Beginning that day and through January of 2014, Plaintiff sent several written communications to various officials within Tulsa County and TCSO. These written communications, which are quoted extensively in his Complaint, are set forth below.

### Email to Commissioners, Albin, and Dorrell

On November 1, 2013, viewing the installation of the Armor system as a "'crisis' situation,"

(*id.* ¶ 23), Plaintiff sent an email explaining his concerns to Albin, Dorrell, Keith, Peters, and a third

Tulsa County Commissioner, John Smaligo ("Smaligo") ("Email to Commissioners, Albin, and

Dorrell"). The email stated:

> My department heard about the new telemedicine contract for the first time less than
> a month ago. Tim Albin quickly assured Linda Dorrell and I that the chosen
> company had their own separate system so my department did not need to be
> involved.
>
> As you probably know, they had a very aggressive project timeline and cut-over to
> their system yesterday at midnight. They also still went ahead with go-live ***knowing
> they overlooked a fairly important aspect of their job function*** that was not known
> until yesterday.
>
> Per their communications below, they want 12 laptops to reside on Tulsa County's
> production network that did not get purchased through my office. This is totally
> different than the understood needs of the project and is in ***total conflict with county
> policy. To protect county-wide operations, I can't allow non-county devices to
> connect anywhere on our production network. It would put every department in
> the county at risk.***
>
> \*\*\*
>
> My immediate recommendation would be that we get a config out today for the
> remaining ten laptops. ... Just like you and I discussed the other day, my department
> really needs to be included from the beginning to avoid these kind of recurring last
> minute ***crisis***. Likewise, I feel the ***new company really dropped the ball on this one***
> and should have been totally upfront with you about their full operational needs.

(*Id.* (emphasis in original).)

### Email to Albin

Plaintiff alleges that in response to his November 1, 2013 email, Albin threatened IT

Department staff, including Plaintiff. On November 2, 2013, Plaintiff sent an email to Albin ("Email

to Albin") stating:

Respectfully, my staff was (very) upset yesterday because they were repeatedly told if someone died [at the Jail], we would be held liable. I find this offensive, threatening, and totally inappropriate. ***The true liability rests on the medical company for waiting until the day of go-live to bring up new requirements, and on you for excluding us from a project that clearly involves the use of technology***.

We sincerely want to help you guys and provide the best support possible, but we need to be treated as part of the team and not as last minute emergency responders.

(*Id.* ¶ 24 (emphasis in original).) The IT Department then went to work as "last minute emergency responders . . . to correct the serious deficiencies with Armor's system integration with the County's system" (*id.* ¶ 25), and Plaintiff subsequently encountered more challenges (*id.* ¶ 26).

### *Email to Keith*

On November 4, 2013, Trimble sent an email to Keith ("Email to Keith"), stating:

You'll probably be getting a call on this from the Sheriff tomorrow and want to be sure you hear the details from both sides.

\*\*\*

Approximately two weeks ago, our Help Desk received a call that the jail's training lab was down. When our tech arrived, the new medical company was onsite trying to connect their equipment to our network. Network security blocks non-county hardware from accessing our production environment to protect operations countywide. To resolve their immediate need, we created an isolated training network to keep training on schedule.

Since that time, my department continues to get pulled in as the technical requirements for their system keep changing. This has progressed from an assurance of no involvement at all to spending more than 300 man hours across six staff trying to accommodate their needs. ***This comes at an expense to other county projects that are being forced to wait***.

[A]t 5:38 p.m. last night, we were notified [Armor's] equipment must connect to our production network to function properly. ***They were aware this was not an option. It is a well-known and long-standing policy designed to protect county-wide operations that all equipment attaching to our network is required to first go through my department and be signed off by me before purchase.***

\*\*\*

4

[W]e've been working on any feasible alternative that would not compromise network stability while addressing this operational need at the jail.

\*\*\*

***Every Office, Division, and supported Agency on our network depends on my department to maintain the most stable and safe computer environment possible. To compromise that trust-and expectation is not something I can do in good conscience*.** An outside vendor's changing needs certainly don't justify it nor do 1[sic] feel the Jail Operator has the authority to require it."

(*Id.* ¶ 27 (emphasis in original).)

### *Email to Dorrell and Turley*

On December 26, 2013, Plaintiff sent an email to Dorrell and Josh Turley, TCSO's Risk

Manager ("Email to Dorrell and Turley"), stating:

I'm trying very hard not to let our frustrations interfere with the common goal, but ***[Armor's] disorganization is flat-out crazy*.**

\*\*\*

My personal opinion is that our department provided every single thing specified on the signed agreement before November 1st cut-over. When we realized that they clearly weren't ready, we are on record that Armor needed to delay until they had tested all aspects of their required services. After it went live, they should have been able to clearly articulate exactly what remained to be done. Even today, that list keeps changing or an item reappears that we thought was already being handled.

My biggest frustration is the number of staff I've taken away from major scheduled projects to provide what was specifically asked for and then be asked that it be done again in a totally different way. Other critical timelines are being impacted. Other elected officials are getting pissed and it makes my department look bad.

The legal implications keep getting brought up and I get that. It is almost analogous to TCSO responding to a bank robbery and calling me because I didn't load their bullets. ***Their HIPPA data currently not being encrypted on my network which is a major concern (that one is not even on your list) [is] yet another screaming reason we need [Armor] on their own subnet so Tulsa County can steer clear of that liability altogether.*** If this were an agreement made through my department, I would have thrown them out immediately....

(*Id.* ¶ 28 (emphasis in original).)

### *Memorandum to BOCC*

On January 9, 2014, Plaintiff wrote a Memorandum to BOCC ("Memorandum") addressing "Serious Support Concerns," and informing BOCC of "inadequate funding and staffing of the IT Department and 'new projects' that had overwhelmed the staff." (*Id.* ¶ 31.)

### *Audit/Termination*

In early January 2014, Peters arranged an audit of the IT Department that Plaintiff alleges was intended to target him in retaliation for his complaints. Plaintiff alleges that the audit was unfair, factually inaccurate, and biased. (*Id.* ¶ 32.) On April 23, 2014, Plaintiff was placed on paid administrative leave, and on May 1, 2014, BOCC voted two to one to terminate Plaintiff's employment. Commissioners Keith and Peters voted to terminate Plaintiff.

On May 9, 2016, Plaintiff filed a single-count Complaint alleging that he was terminated from his position in violation of his First Amendment right to free speech and 42 U.S.C. § 1983 ("§ 1983"). Defendants filed a motion to dismiss, challenging whether Plaintiff's allegations state a plausible claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6), and asserting qualified immunity on behalf of Keith and Peters.

## II.     Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether a plaintiff has stated a claim upon which relief can be granted. At the motion to dismiss stage, courts are "limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint." *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008). The court must "'accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party.'" *Id.* at 1283 (quoting *Moya v. Schollenbarger*, 465 F.3d 444 at 455 (10th Cir. 2006)). "The allegations must be enough that, if

assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Okla., ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). The Tenth Circuit has interpreted "plausibility" to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true." *Robbins*, 519 F.3d 1242, 1247 (10th Cir. 2008). Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Id.* (internal quotation omitted). "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.

The nature of the case determines how specific the allegations must be to establish plausibility. *Id.* at 1248. In the § 1983 context, when defendants assert qualified immunity, the Tenth Circuit has held that plaintiffs "must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearlyestablished at the time." *Robbins*, 519 F.3d at 1249. "This requires enough allegations to give the defendants notice of the theory under which their claim is made." *Id.*

III.    **Motion to Dismiss § 1983 Claim**

Section 1983 provides a cause of action against any person who, acting under color of state law, deprives another of his federal rights. *Howards v. McLaughlin*, 634 F.3d 1131, 1139 (10th Cir. 2011). This claim has four elements: (1) a violation of rights protected by the U.S. Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a person (4) who acted under color of law. *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002). In this case, Plaintiff alleges that Defendants retaliated against him for the "complaints and criticisms"

expressed in the emails and memorandum set forth above, in violation of his First Amendment rights. (Compl. ¶ 41.)

The Supreme Court has long recognized that "the government's interest in regulating the speech of its employees differs significantly from its interest in regulating the speech of the public in general." *Deschenie v. Bd. of Educ.*, 473 F.3d 1271, 1276 (10th Cir. 2007). When a citizen accepts public employment, "'the citizen by necessity must accept certain limitations on his or her freedom.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Specifically, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." *Garcetti*, 547 U.S. at 421. Courts in the Tenth Circuit employ the following five-part test, derived from the Supreme Court's decisions in *Garcetti* and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("*Garcetti/Pickering* test"), to determine whether a public employer impermissibly retaliated against an employee in violation of the employee's First Amendment rights:

> First, the court must determine whether the employee speaks pursuant to [his] official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in [a] detrimental employment decision. Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Brammer-Hoelter,* 492 F.3d at 1202-03 (internal citations and quotations omitted).  In the Tenth Circuit, "[t]he first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact."  *Id.* at 1203.

In their motion to dismiss, Defendants challenge whether Plaintiff's allegations state any plausible claim under the first element.[2]  Defendants contend that all of the speech alleged in the Complaint was made pursuant to Plaintiff's official duties and therefore is unprotected by the First Amendment.  The Tenth Circuit takes "a broad view of the meaning of speech that is pursuant to an employee's official duties."  *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010) (citing *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331 (10th Cir. 2007)).  As a starting point, courts "determine what speech and conduct is at issue" and then "examine [the employee's] job description."  *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 799-800 (10th Cir. 2007).  There is no "formula for determining when a government employee speaks pursuant to his official duties," and courts have resisted setting bright-line rules.  *Rohrbough*, 596 F.3d at 746.  Instead, courts take a case-by-case approach, "looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties."  *Id.*  "[T]he ultimate question in determining whether speech falls within an employee's official duties is 'whether the employee speaks as a citizen or instead as a government employee.'"  *Rohrbough*, 596 F.3d at 746 (quoting *Brammer-Hoelter*, 492 F.3d at 1203).

The Court first determines the speech and conduct at issue.  Plaintiff alleges five distinct instances of speech, all communicated via email or written memorandum, that form the basis of his

---

[2]  Defendants also argue that the Complaint fails to allege facts sufficient to satisfy the fourth step of the *Garcetti/Pickering* test – that the employee's speech was a "substantial factor or a motivating factor" in the adverse employment action.  Based on Plaintiff's failure to allege facts stating any plausible basis for demonstrating "citizen speech" under the first step, the Court does not reach this argument.

§ 1983 claim.[3]  In each instance, Plaintiff raises concerns about the security or stability of the Tulsa County IT network, the role of the IT Department in the implementation of the new medical records system, and/or the impact of Armor's system on the IT Department.  Next, the Court examines Plaintiff's responsibilities as IT Manager.  While no formal job description is available for the Court to examine at this stage of litigation, Plaintiff's allegations, and his emails and memorandum quoted in the Complaint, outline many of his responsibilities.  Plaintiff alleges that the IT Department had input on the decision to replace CHC as the Jail's medical provider.  (Compl. ¶ 16.)  Although Plaintiff initially believed the IT Department would not be involved in Armor's medical records transition, in fact the IT Department ultimately was brought in, "under Mr. Trimble's leadership," to "correct the serious deficiencies with Armor's system integration with the County's system."  (*Id.* ¶ 25.)  As Plaintiff explains in an email to Dorrell, the IT Department "need[s] to be involved with the medical system if [Armor] intends to connect to [the County's] network."  (*Id.* ¶ 21.)  Plaintiff explains in his emails that he had a responsibility "*[t]o protect county-wide operations*" (*id.* ¶ 23 (emphasis in original)), and that he was responsible for approving the purchase of any equipment to be connected to the network (*id.* ¶ 27).  In Plaintiff's own words in his Email to Keith, "*[e]very Office, Division, and supported Agency on our network depends on my department to maintain the most stable and safe computer environment possible*."  (*Id.* (emphasis in original).)

---

[3] In addition to the five relevant communications listed in the Complaint, Plaintiff states that "[d]uring subsequent months" after the Email to Keith, he "continued to raise serious concerns about Armor and its medical records system at the Jail." (Compl. ¶ 28.)  However, Plaintiff only refers to two subsequent communications (the Email to Dorrell and Turley and the Memorandum).  As discussed herein, the Email to Dorrell and Turley was not "citizen speech" entitled to First Amendment protection.  The Memorandum addressed Plaintiff's concerns regarding inadequate funding and staffing of the IT Department.  (*Id.* ¶ 31.)  Plaintiff's general statement that he "continued to raise serious concerns" does not state facts sufficient to plausibly support a claim under 42 U.S.C. § 1983.

Notwithstanding that Plaintiff's emails and memorandum all appear to be clearly related to Plaintiff's responsibilities as IT Manager, Plaintiff offers four arguments that his speech was not made pursuant to his official duties. First, Plaintiff argues that BOCC and TCSO did not consider Plaintiff's official duties to include Armor's electronic records system at the Jail. Plaintiff argues that it is inconsistent for Defendants now to claim that Plaintiff's official duties included that system. In support of this argument, Plaintiff points to (1) his allegation that he "learned, early on, that he, and the IT Department would *not* be a part of the records system transition"; (2) his allegation that he "heard nothing" before July 2, 2013 concerning Armor's "telemedicine" system; and (3) the September 25, 2013 email from Dorrell telling Plaintiff that Albin "*doesn't think you need to be involved*" in Armor's records transition. (Resp. to Mot. 10 (emphasis in original)). Plaintiff has failed to cite any authority that BOCC and TCSO's past views of Plaintiff's job responsibilities somehow bar their argument here. Even assuming Defendants and TCSO initially viewed the Armor records system as outside the scope of the IT Department, the Complaint shows that Plaintiff sought to have input on the transition effort once he learned that it could affect the Tulsa County network. The core of Plaintiff's "complaints and criticisms" appears to be the failure to include his department adequately in the Armor records transition. Plaintiff's communications beginning on November 1, 2013 show that he viewed the transition – and the aspects that he criticized – as relevant to the security and stability of the Tulsa County network. Further, by Plaintiff's own admission, the medical records transition did affect the IT Department, and Plaintiff and his team ultimately were involved in addressing problems related to Armor's system. The fact that officials within BOCC and TCSO initially viewed Plaintiff's help as unnecessary in the medical records transition is not determinative, particularly in light of these admissions. *See Rohrbough*, 596 F.3d at 747-48 (hospital transplant coordinator's complaints to co-workers and observations in written "occurrence reports"

11

regarding understaffing and unsafe conditions were unprotected because, while the speech was not required by her job, it was made pursuant to her "official duties" as the transplant coordinator); *Green*, 472 F.3d at 800 (jail drug lab technician was acting pursuant to her official duties when she arranged for confirmation testing by a third party, even when employee had "ignore[d] her supervisors' instructions" and failed to consult her supervisors, because "even if not explicitly required as part of [plaintiff's] day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do").

Second, Plaintiff argues that because he had no employment relationship with Armor, his criticism of Armor was outside the scope of his official duties. But according to Plaintiff's allegations, the IT Department had input on the replacement of CHC as the Jail's medical provider, was blamed for problems with the Armor system, and was called upon to fix problems with the integration of Armor's system. Even accepting Plaintiff's argument that he "had no official duty with respect to *Armor's* system at the Tulsa County Jail" (Resp. to Mot. 11 (emphasis in original)), Plaintiff's communications, as they related to Armor, all addressed the impact of Armor's system on the IT Department and the Tulsa County network. Plaintiff's lack of an employment relationship with Armor does not transform Plaintiff's communications into "citizen speech" when they plainly related to his official duties.

Third, Plaintiff states that BOCC has argued in another case that TCSO and the Jail are independent of BOCC. Plaintiff contends Defendants therefore "cannot credibly argue" here that Plaintiff had any "official duty" concerning the Jail or its medical records system. (*Id.*) However, that argument misses the relevant issue. As discussed above, the Complaint itself establishes that Plaintiff's official duties included the IT Department's work in connection with the Jail and the medical records system.

Fourth, Plaintiff argues that his emails to officials at TSCO – specifically, the Email to Albin and Email to Dorrell and Turley – were not made within Trimble's chain of command. However, the fact that the recipients were not in Trimble's chain of command is not dispositive; "the proper focus is ultimately still whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do." *Rohrbough*, 596 F.3d at 747. Those emails were sent to individuals within Tulsa County and/or TCSO and focused on matters within the scope of Plaintiff's official duties – namely, the role of the IT Department in the implementation of Armor's system and the Armor system's impact on the security of the Tulsa County network. In the Email to Albin, Plaintiff responds on behalf of "my staff" to Albin's alleged threats, and criticizes Albin "***for excluding us from a project that clearly involves the use of technology***." (Compl. ¶ 24 (emphasis in original).) In the Email to Dorrell and Turley, Plaintiff criticizes Armor's organization, recounts the IT Department's efforts to support the transition, and complains about the impact on his staff. Plaintiff states that, due to the resulting delay on other projects, "[o]ther elected officials are getting pissed and it makes my department look bad." (*Id.* ¶ 28.) While Plaintiff notes his concern that "HIPPA data [is] not being encrypted on my network," he then urges that "***we need [Armor] on their own subnet so Tulsa County can steer clear of that liability altogether***." (*Id.* (emphasis in original).) Nothing in the Email to Dorrell and Turley, or any other speech alleged in the Complaint, suggests that Trimble is speaking as "a concerned citizen." *See Green*, 472 F.3d at 800 (noting that plaintiff "was not communicating with newspapers or her legislators or performing some similar activity afforded citizens"); *Williams v. Dallas Ind. Sch. Dist.*, 48 F.3d 689, 694 n.2 (5th Cir. 2007) (holding that school official's memoranda concerning accounting irregularities in athletic fund were speech pursuant to his official duties, because he needed the information to execute his duties as Athletic

13

Director, and noting that "[t]his is not a case where Williams wrote to the local newspaper or school board with his athletic funding concerns"). Instead, it is clear that Trimble's emails concern Armor's medical records system as it implicates the role of the IT Department and Tulsa County's network, which is clearly within the scope of his official duties. *Cf. Thomas v. City of Blanchard*, 548 F.3d 1317, 1325 (10th Cir. 2008) (holding that city building code inspector's threat to report suspected fraud to Oklahoma State Bureau of Investigation was protected, because plaintiff "was paid to inspect houses, and while informing [his supervisor] of a fraudulent certificate would reasonably have been pursuant to those duties, going outside his normal supervisors and inaugurating a criminal probe would seem not to be").

The Court also notes that three of Plaintiff's communications (the Email to Commissioners, Albin, and Dorrell; Email to Keith; and Memorandum) were sent to one or more members of BOCC, and therefore were indisputably within Plaintiff's chain of command. Speech directed within an employee's chain of command "is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*." *Rohrbough*, 596 F.3d at 747; *see also Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) (noting that generally, "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job") (internal citation omitted)).

Having carefully reviewed the Complaint, accepting as true all of Plaintiff's factual allegations, and viewing those facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's Complaint fails under the first step of the *Garcetti/Pickering* test. Based on Plaintiff's allegations, the Court concludes that all of Plaintiff's speech alleged in the Complaint was made

14

pursuant to his official duties.[4]   Accordingly, Plaintiff's Complaint fails to state a claim for relief

under § 1983.[5]   Because the deficiencies in Plaintiff's claim arise from allegations that are

inconsistent with a plausible claim for relief, rather than insufficient pleading, the Court finds that

leave to amend the Complaint would be futile.   Therefore, the action will be dismissed with

prejudice.

## IV.     Qualified Immunity of Commissioners Keith and Peters

Keith and Peters assert the defense of qualified immunity, which "protects governmental

officials from liability for civil damages insofar as their conduct does not violate clearly established

---

[4]   The Complaint characterizes Plaintiff's speech as relating to "matters of utmost public concern involving the safety and security of County and TCSO data and information." (Compl. ¶ 29.)  The second step of the *Garcetti/Pickering* test, which addresses whether speech is a "matter of public concern," applies only in the context of "citizen speech."  *See Brammer-Hoelter,* 492 F.3d at 1202-03 (internal citations and quotations omitted).  Because the Court finds that Plaintiff has not alleged any "citizen speech," the second step is inapplicable.

[5]   While the factors in the *Garcetti/Pickering* test are often considered at the summary judgment stage, in this instance Plaintiff's allegations in his Complaint fail to plausibly state a claim for relief.  It is not necessary, for example, to conduct discovery regarding Plaintiff's official job description.  Plaintiff's allegations, and his own words as quoted in the Complaint, admit that his job responsibilities encompassed the very concerns raised in each of the emails and memorandum cited in the Complaint.  Further, unlike in many cases, the Complaint sets forth and quotes the precise instances of speech forming the basis of Plaintiff's claim.  Therefore, the Court finds analysis of step one is appropriate at the Rule 12(b)(6) stage.

This case is distinguishable from *Murphy v. Spring*, No. 13-CV-96-TCK-PJC, 2013 WL 5172951 (N.D. Okla. Sept. 12, 2013), in which the undersigned permitted a former school administrative assistant's claim under § 1983 to proceed past the Rule 12(b)(6) stage.  In *Murphy*, the plaintiff was terminated after reporting to school district administrators that several school officials had endangered student health and safety and misappropriated school funds.  This Court found that "the viability of Murphy's claim will turn on more detailed evidence regarding her job description, official duties, and the precise content and delivery of her speech."  *Id.*, 2013 WL 5172951, at *7.  Here, in contrast, Plaintiff has set forth in his Complaint information about his duties as IT Manager, as well as the precise content and delivery of his communications.  The allegations in Plaintiff's Complaint foreclose any plausible claim that Trimble was speaking as a citizen, rather than pursuant to his official duties.

statutory or constitutional rights of which a reasonable person would have known." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). Because the Court finds that the Complaint fails to plausibly allege a deprivation of Plaintiff's First Amendment rights, Keith and Peters are entitled to qualified immunity as to Plaintiff's § 1983 claim.

## V.     Conclusion

Defendants' Motion to Dismiss Plaintiff's Complaint With Prejudice (Doc. 15) is GRANTED.

**SO ORDERED this 18th day of April, 2017.**

**TERENCE C. KERN**
**United States District Judge**